The next case today is Emigrant Residential LLC v. Linda S. Pinti et al. Appeal Number 21-1330. Attorney Renner, please introduce yourself for the record and proceed with your argument. Thank you. Good morning, Your Honors. If I may, I'd like to reserve two minutes for rebuttal. You may. And good morning. Good morning. Thank you. Your Honors, the district court judge made several reversible errors in granting summary judgment here. First and most fundamentally, before reaching the merits of emigrants' equitable request to set aside the mortgage discharge, the judge should have recognized that unclean hands is a predicate issue. That is, before invoking equity, the district court should have considered emigrants' unclean hands. Properly viewed in the light most favorable to appellants on summary judgment, the record shows a pattern of carelessness, failure to comply with Massachusetts law, and other misconduct by emigrant entities over a 10-year-plus period, which closes the doors of equity to emigrants' request for equitable relief. So, are you speaking to their behavior in this case or more broadly? More broadly, Your Honor. And what evidence was there that there was broader misconduct versus carelessness? Well, certainly, and again, the kind of overarching point is this is summary judgment, and viewing the evidence in the appellant's favor. What is the evidence? What is the broader evidence? The evidence is that you have multiple litigations instituted by emigrant entities, their failure to comply with Massachusetts foreclosure laws, their failure to figure out who the proper party is to bring suits, their admitted failure to train their employees, their roughly four year span of sitting on their rights after sending the discharge, and that's all conduct that predates the instant case. And then in the instant case, well, in the Pinty 2 case, I should say, you have their shifting positions about who the proper party is, who the holder of the mortgage is. So, the unclean hands, again, this is one point that I made in the briefs is you can't just look at the unclean hands taking a myopic view of what emigrant or EMC did in the second Pinty case. You have to look at the totality of its conduct. Well, let me look at that totality. It seems like their hands were busy shooting themselves in the foot left and right for a decade, but how does that give rise to, and as a result, your clients got to stay in the property without having to pay. How does that, how does any of their conduct though qualify as the type of unclean hands that would warrant a loss of a request for equitable relief? So this is, I guess, what I would call the windfall argument that's made by emigrant Well, no, I was just trying to tease out the elements of unclean hands. Don't you need to prove that they did something shady that in some way adversely affected your clients? Yes, Your Honor. I guess in unclean hands is just at bottom, it's Four minutes remaining. It's to protect the idea that if someone's coming to the court asking for equitable relief, the court doesn't punish the person, emigrant here. It merely doesn't do anything to help them, and there's another maxim of equity is that equity will not aid a volunteer. So if you create your own mess, the court isn't going to use its equitable powers. But those are doctrines, those are powers that the court has in order for you to insist that the court take those actions. You have to show some sort of harm to your client or some detrimental reliance. And that's what I've been unable to find in this record. All the sloppiness, which characterizes immigrants' behavior, has redounded to the benefit of your client, not to its harm. As Judge Chiara said, they've remained in the property for years without making payments on a substantial mortgage that they received the benefits of. Sure, Your Honor, and I can address that. So we're talking about a $160,000 refinance of a prior mortgage. This is the third round of litigation that my clients have had to endure. It's been hanging over their head for a decade plus. They've incurred significant attorney's fees, all told the costs, and they've been paying other fees, condo fees, etc., in connection with the house. So they haven't exactly been living for free. They reached out. But they haven't made any payments on the mortgage. They admittedly received the mortgage principle, and they haven't made any payments on it. And the fact that there's been litigation has been because they've refused to make payments. Well, Your Honor, they did attempt to reach out. They did reach out to Emigrin and try to enter into a loan modification, and basically Emigrin wouldn't hear them and instead chose to foreclose. So they have reached out to Emigrin in an attempt to try to solve the situation. They haven't satisfied their mortgage obligations. Yeah, they've attempted to get a better deal, but they haven't satisfied their basic mortgage obligations, and there's nothing in the record that suggests there's any equitable reason why they haven't done that. That Emigrin never really gave them the money or something like that. What comes across from the record is that they've attempted to use Emigrin's sloppiness to their own advantage. And they've decided that it's cheaper to resist paying because of that sloppiness rather than to simply defray their mortgage. Well, Your Honor, respectfully, I wouldn't characterize them as... I didn't think you would. No, but seriously, what is the detrimental reliance? How have they relied somehow on what... I mean, has Emigrin in any way hindered them in making their mortgage payments? Your Google Home isn't set up yet. To get started, download the Google Home app on a phone or tablet. I'm sorry, Your Honor, I didn't hear your question. Has Emigrin... Does the record indicate that Emigrin in any way has hindered them in complying with their mortgage obligations? Well, Emigrin wouldn't take their money. They've reached out to Emigrin. They offered to pay the mortgage according to its terms and Emigrin wouldn't take the money? Well, other than the modification that they tried to enter into, and we're going back to 2009 here, 2010, Emigrin just wouldn't deal with them and instead decided to foreclose. And ever since then, they've been defending themselves and they've succeeded in defending themselves all the way up to the SJC in the first Pinty case. And then in the second Pinty case, they prevailed in that case, too. And now this is the third round of litigation. So you asked, how have they been harmed? They've been harmed by having to incur fees and pay costs and other fees associated with the house. Here's what we're trying to get at, because we're sensitive to the possibility that a can harm the borrower. So that's what we're trying to get at. And I guess the question is, the position your clients are in today, are they in a worse position than they would have been in had Emigrin not made all the mistakes that it made? Yes, Your Honor. And could you describe how that is, how your clients would have been better off had Emigrin performed competently? Sure, Your Honor. So again, we're talking about a $160,000 refinance. If they had tried to pay that, they tried to pay that back in the day, 2009. Now you're getting off track because there's nothing in the record that said they tried to make full payment of the note. And then there's no evidence in the record of any loan restructuring. So unless you're going to tell me that there's something in the record that showed they tendered full payment under the note, I go back to the question, how were they? We'd be particularly sympathetic if they were in a worse position today than they would have been had Emigrin not struck. What we're telling you is it looks like, and maybe you can correct us, it looks like they actually benefited greatly from having a lender that couldn't shoot straight. Sure. And here's why I'd say they would have, they've paid more than they owed back in 2009. As a result of all these litigation, they've paid more than they owed. So if they, they've now. So tell us in the record, tell us in the record where we can find that. Sure, Your Honor. If you just give me one second. Well, there's discussion in the record of paying condo fees, paying attorney's fees. I'm happy to supplement after today's hearing with the specific site to the record where that's contained. Off the top of my head, I can't give it to you. But the condo fees were due anyway. Right, Your Honor. But now if Emigrin seeks to foreclose again, then my clients would have, Emigrin would have arguably been unjustly enriched by my clients paying those fees. Your clients have had occupancy of the property all these years. They have, Your Honor. And I just, you know, to circle back to this idea that they've been living without paying the mortgage, the mortgage was discharged. So they've, they've had no obligation. There hasn't been a mortgage for. What? No one's saying they did. No one's saying your client did anything wrong. We're simply reacting to your suggestion that they were harmed by what the other side did. So we're trying to get at that. And if there's something in the record that showed that the total amount that they paid was greater than the total amount they would have paid had Emigrin performed, then you get our attention. Then we'd have to look at who, who gets the appreciation on the property over those, that decade. I think it's your clients, if I read the record correctly. Well, that's kind of the rub why Emigrin, I mean, Emigrin seeking to foreclose the full, Emigrin's looking to recoup the full value of the property, which has appreciated over these years, far in excess of what the underlying debt obligation was. So if we're talking about a windfall, you know, Emigrin seeking to capture that appreciation over all those years, because like you mentioned, because they couldn't shoot straight. Well, your clients could simply sell the house and keep, pay the mortgage off and keep the difference. Well, they've had this issue hanging over, um, this litigation has been pending all the while. They tried to sell the house. I'm sure Emigrin would have had, uh, something to say about that. Um, if, if, if your honor, I would like to just, and we're talking about summary judgment and kind of the overarching point I've made, uh, I'm trying to make is that this equity analysis should have been undertaken by the district court, but was not. I have one last question of you. Did, did this case go to our camp settlement process? It did, your honor. Okay. Thank you. Thank you, Mr. Renner. At this time, Mr. Renner, please mute your audio and video and, uh, attorney, uh, Linehan, please unmute your audio and video and introduce yourself on the record to begin. Good morning, your honor. It's Brian Linehan for the Apelli Emigrant Residential. Good morning. And may it please the court. Uh, briefly, I'd begin to address the court's order regarding diversity jurisdiction. As the court's order points out, emigrant residential is an LLC. So it's a citizenship for the purpose of the diversity analysis determined by the citizenship of its individual members. Here, emigrant residential has one member, that's Emigrin Bank. Emigrin Bank is a state charter bank organized under the laws of New York and its headquarters are located at 5 East 42nd Street in New York City. The defendants here are residents of Cambridge, so the parties are completely diverse for the purpose of the diversity jurisdiction analysis. Now, addressing the, um, the substance of the, um, the issues very quickly, I'll address the court's concerns regarding unclean hands, because there are two important points, uh, that need to be addressed. The first regarding payment of legal fees. There's no actual evidence in this record regarding the payment of legal fees. They state generally that they've paid more in legal fees than the face value of the mortgage, but there's no record of invoices or payments made or canceled checks or even a definitive amount stated in their affidavit. They simply state that they paid more in legal fees and their bare assertions alone are insufficient to defeat summary judgment on the issue. The other point I'd like to make is that, yes, this is the third round of litigation in this case. However, the prior litigation on the claim to strike the discharge, uh, which we'll refer to as Pinty 2, that case was determined on the issue of standing, uh, which resulted from two unrecorded assignments of mortgage that were in emigrant's collateral file at the time of the, uh, first foreclosure. Judge Wolf held that those unrecorded assignments were effective to deprive EMC of standing in this case. That's important because in the Superior Court action back in Pinty 1, the case that went up to the Supreme Judicial Court, the Superior Court agreed with EMC that those were not recorded. They were not effective. So EMC's claim of standing in Pinty 2 was based on the Superior Court's prior decision that those assignments were not effective. So, yes, they did get their case dismissed for lack of standing, but it's not necessarily that, uh, you know, the sloppiness arises to the level that, that is discussed in the briefs because they did have a good faith basis of proceeding on that claim of standing based on the prior ruling from the Superior Court. Although the Supreme Judicial Court later overturned that decision, they did so on the issue of the demand letter. They did not reach the issue of the unrecorded assignments of mortgage. So that, um, as I mentioned, standing, uh, in Pinty 2 was made on a good faith basis on, uh, what was simply a misapplication of the laws to the effect of the assignments of mortgage. But the fact is, counsel, there have been a series of errors on the part of, of your the plaintiffs have been embroiled in this, in this litigation and your client just hasn't been able to get its act together. And, and you now, after all, all these years, presumably you're going to make a claim for a substantial amount of accrued interest are, are seeking to hold, uh, uh, to, to get your own client. You're seeking to get that, uh, reinstated and you're seeking to do so without, uh, without the, uh, defendants even having been allowed any discovery in this case. Is that equitable? Well, Your Honor, on the issue of the discovery, um, well, for us, as Your Honor pointed out earlier during, uh, my brother's argument, their incursion of legal fees throughout this is a result of their own failure to honor their contractual obligation. No, that's not so. It turned out they had perfectly good reason for opposing your legal proceedings because they were brought in error. That's, that's true. They succeeded in the prior litigation. So you can't criticize them too much for having resisted the, uh, overtures of immigrant. Of course. And that's certainly their right to challenge on legal basis. And they were successful in those cases. However, the underlying concern is that the contract requires them to make payments and they did not make payments. So whether emigrant properly followed the law and seeking to foreclose the loan, that's a secondary issue. The underlying issue is if they had either made their payments, they would not have been subjected to this litigation. Or if they accepted the fact that emigrant is entitled to foreclose, they could have come to a negotiated agreement to relinquish possession with avoiding foreclosure. They took no options and instead decided to dig their heels in for what has been approximately 10 years. There was a reference to a four-year delay that Mr. Renner made. Is that correct? Was there a four-year period when the discharge was of record and your client did nothing? No, Your Honor. The four-year delay that my brother counsel references is between the date that the discharge was mailed to the defendants for reporting and when emigrant brought its claim to strike the discharge in Pangee II. The discharge sat unrecorded in the defendant's possession for three years. That discharge was issued shortly after the first foreclosure back in 2012. Did your business files indicate that they had been sent a discharge? We discovered the discharge when we reviewed the title prior to litigation in Pangee II. I'm not sure if that was in the electronic records of EMC at that time. We, speaking to the discovery issue that Judge Sellier raised, we did conduct extensive discovery in Pangee II on the issue related to the discharge. So, they had the opportunity to look into emigrant's files to find out when they sent it and when it was recorded. But the concern here is that this claim is not necessarily for an injunction to prevent the defendants from enforcing the discharge by which emigrant could have sought relief in having them return the discharge or destroy the discharge. This claim arose as a matter of title to the property. So, emigrant's claim doesn't accrue until that discharge is recorded. Is emigrant claiming any costs, any attorney's fees and costs? Emigrant has not added attorney's fees for the prior litigation to its total debt. And if they are successful in this action, they would be entitled to recover those fees. But I have not discussed the recoverability of the fees in this case. But they have not added attorney's fees for the prior unsuccessful litigation or the unsuccessful foreclosure. So, right now, as it stands, your client might still claim some attorney's fees as a result of all this litigation? We have not discussed that with them, whether they're going to seek recovery for the fees in this case. So, as it stands right now, the total debt that was referenced in the summary judgment motion is the principal and interest. And I don't believe that includes the attorney's fees for this case, Your Honor. But as I mentioned, I'm not entirely positive on that issue. But wouldn't that be inequitable? If you incurred all these attorney's fees because your client made mistakes that were called to its attention, and then you want them to pay for that? If emigrant was seeking to recover the fees for the invalid foreclosure, the dismissed case in PG-2, certainly. But in this case, this case... Well, wouldn't they have a right to know that? Wouldn't they have a right to know that? Isn't that why discovery is important? I'm sorry, to know which issue, Your Honor? If you were seeking attorney's fees. Yes. Yes, Your Honor, they would. And that information was in the summary judgment affidavits. There's a statement of the total debt owed, which includes principal interest and the taxes that emigrant has paid to date. But the analysis is that this claim arose from the defendant's decision to record that discharge after the Supreme Judicial Court invalidated emigrant's prior foreclosure. So at that time, they concede that they knew of the decision. That decision came down on July 17th, 2015. They didn't record the discharge for a little over two weeks later. I believe it was July 29th of 2015 or 27th. I could have those dates confused. But so they knew that the foreclosure was invalid. That is void ab initio. So the mortgage is still enforceable at that point. And they elected to record that discharge. So any attorney's fees that emigrant is incurring in this case, assuming they are successful on appeal, those would be recoverable under the note in mortgage because those provisions of the contract allow emigrant to recover attorney's fees in enforcing its rights under the mortgage. So it wouldn't exist if your client had done things right in the very first instance. Certainly, Your Honor. But it's not necessarily the mailing of the discharge because, as I mentioned, the defendants were on notice that the foreclosure was void and that the mortgage remained enforceable. And that's when they elected to record the discharge three years after they received it. You're providing some ample support for some of the equitable claims of the other side here. Well, I mean, and I'm sure that in this case, emigrant would be willing to waive those attorney's fees for this case if that were a matter of consideration for the court. But that wasn't addressed in the court below. That could have been something that was raised in the settlement negotiations or, you know, during either at the ADR conference or the settlement conference in this case or at any time during the prior litigation. But it was not necessarily raised. But if the emigrant is reserving the right to add all these damages, why shouldn't the defendants at least be given the right of discovery? They were given the right of discovery. No, they were given the right of discovery in 22. They've had no discovery in this case. That's because all of the discovery is overlapping. The parties are. No, it isn't because there are events that have occurred subsequently and the issue. Excuse me. The issues are different. There was no incentive in 22 for them to do certain discovery because they had a good defense of lack of standing. Your Honor, that's the whether they had an obligation to conduct discovery does not necessarily turn on how the case was ultimately resolved because in the orders that are in the record. They may not, but their incentives are important. They are certainly, but the procedural documents that are in the record, including Judge Wolf's trial order from 22 and the scheduling order in 22 clearly state that discovery was phased in that case. The first round of discovery, which is prior to the motion for summary judgment in 22, Judge Wolf clearly states discovery will be tailored to the issue of the discharge of the mortgage. They conducted all of the discovery, including interrogatories, document requests, and a deposition of Joel Marcano, who's the assistant treasurer and the 30B6 witness. They conducted all of that discovery. They proceeded to summary judgment. After Judge Wolf denied the summary judgment motion on the issue of the discharge, he then set another phase of discovery for issues related to the standing analysis, the unrecorded assignments and mortgage and whether they were delivered. But there was also additional discovery conducted on the issue of discharge during that phase because they sought and obtained a deposition of Anna Sorvio, who is the employee who actually created the memo that led to the mistake. So they did conduct extensive discovery on the discharge issue, and so they can't now claim that they did not have a meaningful opportunity. And the only thing that's changed is the parties and the post-52 assignments of mortgage, which are presumptively valid on the record under Section 54B of Chapter 183. Any additional questions? So to be clear, as the record now stands, if we were to rule for you tomorrow and this appeal, your client has reserved the right to put them through litigation over recovering your attorney's fees in this action? No, Your Honor. They would recover that through the foreclosure sale. So when they accept... Right. Those fees, I didn't say in this action. Right. So if they are recoverable, and like I said, this wasn't necessarily briefed in the court below, so we would have to look at the contract again to see the nature and extent of whether this action falls within the scope of that. But they have been so far willing to waive attorney's fees on circumstances where, you know, the prior invalid foreclosure and the issues in 52 and all the attorney's fees that have been incurred so far. So I have no reason to believe that if they are not entitled to recover those fees under the contract, that they would chase them in the foreclosure sale. Thank you. Thank you, Your Honor. There's no further questions. I'll rest on the briefs. Thank you, Mr. Linehan. Please mute your audio and video at this time. Attorney Renner, please unmute your audio and video and introduce yourself back on the record to begin. Two minutes. Good morning, Your Honor. Eric Renner for the appellants. Quick, there was a discussion about how my clients have been harmed. They sought the modification, as I said. Your Honor's asked for a cite to that. Um, they also they in an affidavit submitted by Appellant Pinty, that's a joint appendix 691, 692 through 693. She goes through how they applied for a reverse mortgage. They were trying to get a reverse mortgage, which they qualified for, but for immigrants refusal to work with them. And so they would have qualified for a reverse mortgage had immigrant not taken the position that it's entitled to, you know, basically not just the principal amount or what was owed, but interest, attorney's fees, all these extra costs. My clients lost that right because that program no longer exists. So they can't get a reverse mortgage. EMC. Mr. Renner, what additional information would you be seeking in discovery? That you haven't already obtained. Well, so we have I haven't harped on this yet, but the Marcano affidavit is a huge one, as well as what immigrant knew and when it knew it regarding the discharge. The Marcano affidavit has problems, numerous problems that are detailed in the brief, and that served as the entire underpinning for the district court's ruling that there was a mistake in the first place. Without the Marcano affidavit, there was no evidence to support the notion of a clear and decisive evidence of a mistake made by immigrants. What other explanation is there other than a mistake? Is there any suggestion or evidence that this that this mortgage note was paid? Well, the mortgage, the note, the debt obligation, there was no the statute of limitations had run for the note. Right. No, there wasn't payment. But so, you know, a mortgagee doesn't simply discharge a mortgage out of the goodness of its corporate heart. All right, if there's no payment on it, no mortgage modification. All right, the explanation has to be a mistake. There must have some affirmative evidence that there was some reason for the discharge who was part of a negotiation, something of that sort. And I guess what I would say, Your Honor, is on summary judgment, we're talking about burdens of proof, and that's not my clients are not the ones with the burden of proof just to prove there wasn't a mistake. It's immigrants burden to prove that there was a mistake. And the evidence they submitted was the Marcano affidavit, which is problematic because it's not based on personal knowledge and it's hearsay. He's talking about all these policies and procedures, which were not part of the record. So unless Your Honors have any further questions, I'll rest of the briefs. Thank you. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the hearing.